**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 01-3766-CIV-HURLEY**

**MARY REESE et al.,**
        **plaintiffs,**

**vs.**

**MIAMI-DADE COUNTY, et al.,**
        **defendants.**
_____/

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**
**& DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

The case is before the court on the parties' amended cross-motions for summary judgment [DE ## 336, 337, 347 and 349].   A hearing upon this matter was conducted on October 7, 2009. For reasons set forth below, the court has determined to grant the defendants' motions and enter final summary judgment.

### I.  Procedural Background

Scott Homes and Carver Homes (collectively "Scott-Carver Homes") are two public housing developments located in Liberty City, Miami.  Built in 1954 and 1964, respectively, the projects were situate in Miami-Dade County and operated at all material times by the Miami-Dade County Housing Agency (MDHA).

Plaintiffs, former residents of Scott Homes, filed this class action lawsuit in 2001 against defendants Miami-Dade County and the United States Department of Housing and Urban Development (HUD), alleging that the defendants discriminated against them on the basis of race in the approval, funding and implementation of a revitalization plan for Scott-Carver Homes.  At the time the lawsuit was filed, Scott-Carver Homes contained 850 public housing units and 99%

of its residents were African-American.[1]

At the inception of the lawsuit, plaintiffs filed a motion for preliminary injunction seeking to halt the demolition of Scott Homes units and prevent the "forced or voluntary" relocation of any Scott Homes residents in the County's implementation of its revitalization plan. A predecessor judge denied the requested injunctive relief, finding no likelihood of success on the merits on any of plaintiffs' federal claims. *Reese v Miami Dade County*, 242 F. Supp. 2d 1292 (S.D. Fla. 2002), *aff'd,* 77 Fed. Appx. 506 (11th Cir. 2003). After that ruling was affirmed on appeal, defendants proceeded forward with demolition of the Scott-Carver Homes project.

On September 30, 2003, the predecessor judge ordered a continuance of trial based on the then pendency of the parties' original summary judgment motions (filed in November 2002). [DE# 299]. Although this order expressed the court's intent to reset the case for trial by separate order, there was no further activity in the file until October 27, 2008, when the case was reassigned to this division. [DE# 299].

Following reassignment, this court ordered submission of updated summary judgment motions and denied the parties' original summary judgment submissions as moot. [DE# 308]. The parties have since filed amended summary judgment motions [DE# #336, 337, 347 and 349] which are ripe for disposition.

## II. The Complaint

Under their current complaint, plaintiffs press forward with claims for declaratory and injunctive relief relating to the planned redevelopment of the Scott-Carver project. Specifically,

---

[1]The certified class consists of all African- American residents of Scott Carver Homes as of September 17, 1999.

they seek an injunction requiring the defendants to develop and implement a revitalization plan for Scott-Carver Homes which does not have a disparate impact on African-American families, does not result in a forced, permanent relocation of former Scott Homes residents, and replaces all demolished public housing units on a one-to-one basis (850 units) in the Liberty City neighborhood around the original Scott Homes site.

They assert following constitutional and statutory claims: [2]

- Fair Housing Act (42 U. S. C. §§ 3604 (a), (c), 42 U.S.C. § 3608 (e)(5)) (Title VIII)

- Title VI of Civil Rights Acts of 1964 (42 U.S.C. §2000d)

- Equal Protection Claims ( Fourteenth Amendment, Fifth Amendment)

- Quality Housing and Work Responsibility Act (QHWRA) ( 42 U. S. C. §1437v)

- Housing and Community Development Act (42 U.S.C. § 5304(d)(2)(A)(i))

The complaint names two sets of defendants – the "County defendants," consisting of Miami-Dade County, a political subdivision of the State of Florida, and the Director of the County's Miami-Dade Housing Agency ("MDHA"),[3] and the "Federal defendants," consisting of the United States Department of Housing and Urban Development ("HUD") and the Secretary of

---

[2] The predecessor judge dismissed plaintiffs' claim against the County Defendants under the Uniform Relocation Assistance and Real Property Acquisition Act of 1970 [DE# 137]. In their current summary judgment papers, plaintiffs express an intent to drop their corresponding claim against the Federal defendants (Count 14) and their FHA claim against the County defendants for intentional discrimination based on family status (Count 2).

In an earlier pretrial stipulation, plaintiffs voluntarily dropped their claim under the National Environmental Policy Act (Count 15). Pursuant to plaintiff's voluntary notice of dismissal, these claims, Counts 2, 14 and 15, shall be dismissed with prejudice.

[3] Rene Rodriguez was originally named as defendant in this capacity. The County defendants note that he is succeeded by current Interim Director Cynthia W. Curry, and request a corresponding substitution of party defendant.

HUD.[4]

The thrust of plaintiffs' complaint is that the Defendants' configuration of the Liberty City HOPE VI project was consciously designed to discourage African-Americans from living in the redeveloped Scott Homes neighborhood, and that the County's revitalization plan, as approved by HUD, will result in "the destruction of desperately needed affordable housing for very poor families in the Scott Homes community, who are overwhelmingly African-American" and the "forced displacement of the predominantly African-American residents of the Scott Homes community."

### III.  Facts

In 1992, the Congressional Commission on Severely Distressed Public Housing was established to identify severely distressed or obsolete public housing developments and to offer solutions for their revitalization.  The result of the Commission's inquiry was the "Homeownership and Opportunities for People Everywhere" or "HOPE VI" program, a competitive grant program designed to prompt public housing agencies to develop and implement innovative strategies for the revitalization of their most troubled public housing projects and surrounding neighborhoods.

In 1999, the HOPE VI program was codified at 42 U.S.C. § 1437v, when the Quality Housing and Work Responsibility Act of 1998 (Public Housing Reform Act) amended section 24 of the 1937 Act.  The goal of this legislation is to stimulate positive socio-economic change by:

(1) improving the living environment for public housing residents of severely distressed public housing projects through the demolition, rehabilitation, reconfiguration or replacement

(2) revitalizing sites (including remaining public housing dwelling units) on which

---

[4] Mel Martinez was originally named as defendant in this capacity.  The federal defendants note that he is succeeded by Shaun Donovan, and request a corresponding substitution of party defendant pursuant to Fed. R. Civ. P. 25(d).

such public housing projects are located and contributing to the improvement of the surrounding neighborhood;

(3) providing housing that will avoid or decrease the concentration of very low-income families; and

(4) building sustainable mixed income communities.

42 U.S.C. § 1437v(a)(1)-(4).

HOPE VI effected numerous policy changes, including elimination of federally mandated admission preferences, repeal of "one for one replacement" requirements on demolished units, and transfer of admission standards to the control of local housing authorities. In addition, site selection restrictions were lifted for HOPE VI grantees, allowing recipients to redevelop housing on the footprint of previously distressed public housing developments and in surrounding neighborhoods.

HUD is charged with responsibility for carrying out the Congressional purposes of the HOPE VI statute. Toward this end, it has developed a competitive funding process that rewards applicants who best demonstrate the intent and ability to reduce concentrations of very low income populations and create mixed income communities. 42 U.S.C. §1437v(e).[5] The statutory purposes, eligible activities and application procedures of the HOPE VI program are enumerated in 42 U.S.C. § 1437v(a), (d) and (e).

In 1996, HUD published a Notice of Funding Availability ("NOFA") seeking HOPE-VI grant applications from public housing authorities around the country. Miami-Dade County determined that Scott Homes would be a good candidate for a HOPE VI revitalization grant because of its age, structural defects, infrastructure defects and high population density and

_____

[5]Through § 1437v(e)(2), Congress provided to the Secretary of HUD the authority to establish selection criteria for the award of HOPE VI Grants.

accordingly submitted its first application for HOPE VI funding in 1996.

Following HUD's rejection of its 1996 application, County defendants met with Bob Prescott, a Deputy to the HUD Director of the HOPE VI program, who debriefed the County on the reasons for the failure of its application. Prescott advised that the 1996 application was unsuccessful because it would result in a project that was "still almost 100% single head of households, non-working, mostly AFDC, 97% African-American, a homogenous concentration of like families." [DE# 355, Ex. 5, DE# 200, pp. 33-37]. Prescott also expressed concern over the "lesser amount of demolition and not changing the tenant body... there was not that dramatic a change either physically or socially." The County sought to address these concerns in new HOPE VI grant applications submitted in 1997 and 1998, but these applications, too, were unfunded.

On February 26, 1999, HUD issued a "Super Notice of Funding Availability" ("Super NOFA") announcing the availability of approximately $523 million in HOPE VI revitalization funds. The Super NOFA identified the following qualifying criteria for successful applicants:

(a) The proposal must be designed to lessen the concentration of low income households, create opportunities for desegregation, and offer viable housing choices in the design of the new development;

(b) The proposal must affirmatively further fair housing and encourage diversity by physical design of the revitalized units; location of the new units, and marketing of housing types;

(c) The applicant must certify that it has matching funds, which could be combined with HUD funds to carry out the revitalization efforts;

(d) The applicant must comply with requirements of the Uniform Relocation and Real Property Acquisition Act.

HUD's 1999 Super NOFA included a section explaining the five "rating factors" used to review and score HOPE VI grant applications:

(1)     Capacity (20 possible points)

(2)     Need (20 possible points)

(3)     Soundness of Approach (40 possible points)

(4)     Leveraging Resources (10 possible points) and

(5)     Comprehensiveness and Coordination (10 possible points).

Each rating factor is subdivided into a number of subfactors, and each subfactor is assigned a maximum point total. Of particular relevance here, under the third rating factor, "soundness of approach," is a sub-factor entitled "affirmatively furthering fair housing" (sub-8) which provides for a maximum sub-score of five points. To receive maximum points under this subfactor, the HUD Super NOFA and corresponding application kit explain that the applicant "must affirmatively further fair housing though the physical design of the revitalized units, the location of new units, and marketing of housing that will encourage diversity."

Under a subdivision (8)(b), captioned "diversity," HUD further advises:

To receive maximum points, program activities must aid a broad diversity of eligible residents, including the elderly, the disabled, etc. HUD will also evaluate your efforts to increase community awareness in a culturally sensitive manner through education and outreach, as applicable. Describe specific steps to address the elimination of impediments to fair housing that were identified in your jurisdiction's Analysis of Impediments to Fair Housing Choice, remedy discrimination in housing, or promote fair housing rights and fair housing choice. Your marketing and outreach activities should be targeted to all segments of the population on a nondiscriminatory basis, promote housing choice and opportunity throughout your jurisdiction, and contribute to the deconcentration of minority and low income neighborhoods.

[DE# 352-4, p. 34]

Rating factor number 3, "soundness of approach," also includes a sub-factor entitled "lessen concentration," allowing for a nine point maximum sub-score. To receive maximum points under this subfactor, the applicant's revitalization plan "must reduce the isolation of low -income residents, create opportunities for desegregation, and offer viable housing choices." [DE# 352-4, p. 27]. This subfactor factor is further divided into two additional components - "physical plan and design" (6 possible points) and "Section 8" (3 possible points).

Under "Physical Plan and Design," [¶ (3)(a)], HUD's 1999 Super NOFA explains in pertinent part that maximum points are available to the applicant showing that :

> (i) The physical plan and design of the proposed on site housing will significantly reduce the isolation of low income residents and/or significantly promote mixed income communities in well functioning neighborhoods.

> (ii) Any plans for off site housing will lessen concentration of low income residents and create opportunities for desegregation by activity ensuring that locations of housing will not be in neighborhoods with high levels of poverty and/or high concentrations of minorities. (You do not have to have selected the precise location of site units in your application to receive full points for this element)

According to the unrebutted affidavit of Susan Wilson, Director of HUD's Office of Urban Revitalization,[6] the reference to "desegregation" in the HUD Super NOFA and corresponding Application Kit "refers to the desegregation of low income households, a congressionally mandated purpose of the HOPE VI program, 42 U.S.C. 1437v(a)(3)," [WILSON AFFIDAVIT, at ¶11 [DE# 334-2], while the "Section 8" component of the "lessening de-concentration" factor concerns

---

[6] Wilson has held this post since 2006. She was involved in review and scoring of HOPE VI grant applications nationwide during fiscal years 1997-98 and 2000-2008, and was "Team Leader" at the time the subject grant was awarded to MDHA.

provision of relocation assistance for residents receiving Section 8 certificates and vouchers.[7]

In 1999, HUD developed a "Guidance" for evaluation of HOPE VI applications by the Fair Housing and Equal Opportunity and Public and Indian Housing Office. This Guidance mirrors the language of the Super NOFA, including the advice that "locations of offsite housing will not be in neighborhoods with high levels of poverty and/or high concentrations of minorities." [DE# 167] It also encourages specific actions such as "selecting sites for replacement housing that have the effect of deconcentrating minority persons..." and "reduc[ing] the existence of racially identifiable projects." [DE# 167]

In May, 1999, the County submitted its fourth HOPE VI grant application. At that time, 99% of Scott-Carver Homes residents were African-American, while African-American families comprised 64% of the total households in MDHA public housing, and 20% of the general population in Miami-Dade County.

The County's 1999 application proposed to dramatically lessen on-site density at Scott Carver by 56%, calling for demolition of all 850 public housing units and replacement with 371 on-site units [80 public housing units, 135 public housing rent-to-own units, and 156 affordable homeownership units] and 91 off-site units of affordable homeownership. The 1999 Revitalization Plan contemplated relocation of all Scott -Carver Homes residents over a four year period to alternative housing through Section 8 vouchers and other MDHA public housing, homeownership

---

[7] The "Section 8 Voucher Program" is a portable, tenant based federal subsidy that families use to rent housing in the private rental market. It is administered through various state housing agencies, such as Miami-Dade Housing Agency

and rent- to-own programs. [8]

Under a section of the 1999 application captioned "We cannot control," the County states in pertinent part that "We cannot control HOPE VI requirements mandated by HUD" which require the County to "lessen the concentration of poverty," and "discourage concentrations of minorities in undesirable neighborhoods." In this same section, the application references the "*Adker* Decree," a consent decree entered by Judge Paine in *Adker v United States Dept of Housing and Urban Development*, Case No. 87-00874, which required the County to desegregate its Section 8 and public housing programs.

The County's 1999 Revitalization Plan included a commitment of approximately $65 million in additional resources to complete the proposed revitalization. Of this amount, the County's Office of Community and Economic Development ("OCED") committed $2 million in Community Development Block Grants ("CDBG").

HUD approved the County's 1999 HOPE VI application, and, on August 15, 1999, awarded the County a $35 million HOPE VI grant for revitalization of Scott-Carver Homes. The award was based on a point score of 96/100 on the MHDA's application, with nine out of nine possible points assigned for the "lessening concentration" sub-factor. According to HUD, the MHDA's proposed deconcentration of low income families was crucial to the success of its application.

---

[8] The County defendants predicted that 469 of the original 850 Scott Carver Homes families would be forced to permanently relocate using Section 8 vouchers , while 178 families would be forced to permanently relocate to other public housing projects. [DE# 167].

They estimated that 44 of the original 850 would qualify to purchase one of the planned 149 homeownership units, where the minimum "qualifying income" for three bedroom home was estimated between $19,000 and $21,500 and a four bedroom between $23,596 and $24,330.

Shortly after the award was announced,  Scott-Carver residents complained to the Miami-Dade Board of County Commissioners about the limited  amount of planned replacement housing. In response, on  April 10, 2001, the Board adopted  Resolution  R-376-01, authorizing the transfer of $6 million  to the  Miami- Dade Housing Finance Authority for  the construction of one hundred and fifty (150)  single family homes for purchase  by public  housing residents,  with a right of first refusal  to  Scott -Carver displacees.

On May 8, 2001, the  Board  of  County  Commissioners  adopted  Resolution  R- 495-01, authorizing the MDHA to construct an additional 175 units of Section 8  based affordable rental housing units to accommodate  Scott Carver Homes residents displaced as a result of the HOPE VI Project.

To  facilitate ongoing  relocation of  Scott-Carver  displacees,  the County defendants allowed  large, multi-generational  families to split up, with each family group offered alternative MHDA public housing or Section 8 vouchers.   Over 1170 families were relocated in this fashion. By 2004, the Scott-Carver site was essentially vacant.

Meanwhile,  reconstruction at the site came to a standstill.  A 2004 internal audit ordered by the County  found that only one "in -fill" home had been constructed  with funds designated by  R-376-01, and only seven Scott-Carver families had been granted mortgages.

In 2005, the  Board  of  County  Commissioners  vacated  R-376-01  and  transferred  the remaining funds to the MDHA Development Corporation along with the vacant lots.  However, this entity also failed to move forward with construction, prompting the Board to  ultimately retrieve the funds and seek return of the lots.

By 2007, 846 of the original 850 Scott-Carver Homes had been demolished,[9] and all residents relocated.  Although the County had originally pledged  a sophisticated tracking database to follow and assist displaced families,  the promised  database was never developed, and, by 2006 the County had lost track of hundreds of relocated families. [DE# 17].  In response to the community outcry, the Board of County Commissioners passed  Resolution R-1436-06 in 2006, promising to fund  a coordinated "public relations," media and intergovernmental campaign to track the lost Scott-Carver residents.

Community organizers, such as The  Miami Workers Center, undertook their own efforts to find displaced residents, and through door-to-door canvassing and billboard advertising, eventually found hundreds of "lost" families,  many of whom by then were homeless, doubled up with relatives, or living in cars.   For a brief period, the MDHA worked with these community leaders to reintegrate one hundred-forty  "found" families back into public housing.

In 2006, the Miami Dade County Inspector General did an internal audit of the MDHA HOPE VI  housing revitalization plan, finding gross  fiscal mismanagement and lack of oversight in its administration.  For example, of  the  $3,509,697.00  budgeted  for support to relocatees, it found  85 cents on the dollar spent for  inadequate program administration, and 15 cents on the dollar for actual program services. [DE# 335, Ex. 24, 25]   Partially due to this  mismanagement of  the HOPE VI program,  the  federal  government  placed  the  MDHA  into receivership in 2007 and assumed  control over its operations.

In  2008, the County entered into a  Master Development Agreement with a  new  developer, McCormack Baron Salazar Inc.,  to complete the project.  Under the proposed  McCormack plan,

---

[9]At the residents' request,  four units  were  left standing for historical purposes.

devised with input from former Scott-Carver residents and community groups, the revitalized project would contain 177 traditional public housing units and 177 rental units. The County defendants' request for approval of this revision is still pending before HUD.

In December, 2008, the Miami Dade Board of County Commissioners passed Resolution R-1416-08, requiring the County to use its "best efforts," to replace Scott-Carver housing on a one-for-one basis in the surrounding neighborhoods through project-based Section 8 vouchers that would be affordable to relocated residents. This Resolution calls for the Mayor to identify up to 850 annual contribution contract equivalent units in the expanded HOPE -VI target area, with a right of first refusal to Scott- Carver displacees. To date, however, no funds have been allocated for its implementation.

More than half of the County's $35 million HOPE VI grant for the Scott-Carver revitalization project is now spent, and there is no completed construction at the site except for a small section of single family homes (57 homes) built by Habitat for Humanity under contract with the County. Of these, forty-one homes have been purchased by former Scott-Carver Homes residents, nine by public housing residents, three by Section 8 residents, and four by individuals living within the HOPE VI target area.

## IV.  Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "material" if it is a legal element of the claim under applicable substantive law that may affect the resolution of the action. *Anderson v Liberty Lobby,*

*Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986).  An issue is "genuine" if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party. *Id.*

The movant may meet this standard by presenting evidence demonstrating the absence of a dispute of material fact, or by showing that the nonmoving party has not presented evidence in support of an element of its case on which it bears the burden of proof.  *Celotex Corp v Catrett,* 477 U.S. 317,  322-33, 106 S. Ct. 2548,  2552-53, 91 L. Ed.2d 265 (1986).  It is not necessary for the moving party to supply affidavits or other similar materials negating the opponent's claim.  *Id.*

Once the movant meets its initial burden of proof, the nonmovant must "go beyond the pleadings" and by affidavit, deposition testimony, answers to interrogatories and admission, designate  "specific facts showing that there is a genuine issue for trial."  *Id.* at 324, 106 S. Ct. at 2552-53.  The nonmovant need not present evidence that would be admissible at trial, but "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v Zenith Radio Corp.,*  475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Anderson,* 477 U.S. at 249, 106 S. Ct. 2505.

At the same time, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his  favor.  *Anderson,* 477 U.S. at 255, 106 S. Ct. 2505.  The nonmovant need  not be given the benefit of every inference, but only of every reasonable inference.  *Brown v City of Clewiston*, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).

Finally,  the findings of  fact and conclusions of law made  at  the preliminary injunction stage in this case  are not binding on the Court in this subsequent summary judgment proceeding.

*Texas v Camenisch,* 451 U.S. 390, 395 (19801); *McArthur v Firestone*, 817 F.2d 1548 (11th Cir.

1987); *ABC Charters Inc. V Bronson*, 591 F. Supp. 2d 1272 (S.D. Fla. 2008).

## V. Discussion

The Fair Housing Act was passed in 1968, pursuant to Congress' Thirteenth Amendment

powers, with the declaration that "[i]t is the policy of the United States to provide, within

constitutional limitations, "for fair housing" throughout the United States. 42 U.S.C. § 3601;

*United States v Starrett City Associates,* 840 F.2d 1096 (2d Cir.), *cert. den*., 488 U.S. 946 (1988).

The statute bans discrimination because of "race, color, religion, sex, familial status, or national

origin" in connection with the sale and rental of housing and other private real estate transactions,

subject to limitations imposed by the statute. 42 U. S. C. §§ 3604, 3605.

Under the Act, the Secretary is required "to administer the programs and activities relating

to housing and urban development in a manner affirmatively to further the policies of" the statute.

§ 3608(e)(5). The Secretary must study the nature and extent of "discriminatory housing

practices," §3608(e)(1), and report annually to Congress "data on the race, color, religion, sex,

national origin, age, handicap and family characteristics "of persons who participate in, benefit

from or who may benefit from HUD programs." § 3608(e)(6). The Secretary must also confer

with State and local officials on "the extent, if any, to which housing discrimination exists" in

states and localities and how "State or local enforcement programs might be utilized to combat

such discrimination." §3609.

While "the Act was designed primarily to prohibit discrimination in the sale, rental,

financing, or brokerage of *private* housing and to provide federal enforcement procedures for

remedying such discrimination so that members of minority races would not be condemned to

15

remain in urban ghettos in dense concentrations where employment and educational opportunities were minimal," the Act also requires the Secretary of HUD to consider "the impact of proposed *public* housing programs on the racial concentration in the area in which the proposed housing is to be built." *Otero v New York City Housing Authority*, 484 F.2d 1122, 1133-34 (2d Cir. 1973).

The Act bans practices that are motivated by a racially discriminatory purpose as well as those that disproportionately affect minorities. *Starrett City*, 840 F.2d at 1100. It is designed to ensure that "no one is denied the right to live where they choose for discriminatory reasons." *Id*., citing *Southend Neighborhood Improv. Ass'n v County of St. Clair*, 743 F.2d 1207, 1210 (7th Cir. 1984). Overall, "Congress saw the anti-discrimination policy [embodied in the Fair Housing Act] as the means to effect the antisegregation-integration policy." *Id.*

Under § 3608(e)(5), HUD has an obligation administer its programs and activities in a manner which "affirmatively furthers" fair housing. This affirmative obligation may subject it to liability in two types of situations – first, when HUD takes discriminatory action itself, such as approving federal assistance for a public housing project without considering its effect on the racial and socio-economic composition of the surrounding area, and second, when it is aware of a grantee's discriminatory practices and makes no effort to force it into compliance with the FHA by cutting off existing federal financial assistance to the agency in question. *Anderson v City of Alpharetta, Ga.,* 737 F.2d 1530 (11th Cir. 1984), citing *Shannon v HUD*, 436 F.2d 809, 811 (3d Cir. 1970) and *Gautreaux v Romney*, 448 F.2d 731 (7th Cir. 1971). *See also N. A. A. C. P. v Secretary of HUD,* 817 F.2d 149, 155 (1st Cir. 1987)(Breyer, J.) (Congress intended for HUD to "use its grant programs to assist in ending discrimination and segregation, to the point where the supply of genuinely open housing increases"); *Darst-Webbe Tenant Assoc. Bd v St. Louis Housing Authority*,

16

339 F.3d 702 (8th Cir. 2003); *M & T Mortgage Corp. v White*, 2006 WL 47467 *8 (E. D. N. Y. 2006).

## A. County Defendants

### 1. Fair Housing Act (FHA) Claim

### (42 U.S.C. § 3604 *et seq*., Title VIII of Civil Rights Act of 1968)

Section 3604(a) of the Fair Housing Act , 42 U.S.C. § 3604 *et seq.*,  Title VIII  of the Civil Rights Act of 1964,  provides that it is  unlawful "[t]o refuse to sell or rent ... or otherwise make unavailable or deny ... a dwelling to any person because of race ..."

Section 3604(c) of the Fair Housing Act provides it is unlawful to "make,  print or publish ... any notice, statement or advertisement with regard to the sale or rental of a dwelling that indicates any preference, limitation or discrimination based on race ..."

In order to prevail on a claim under the FHA, a plaintiff must  show "unequal treatment on the basis of race that affects the availability of housing." *Jackson v Okaloosa County, Florida*, 21 F.3d 1542 (11th Cir. 1994).   Unequal treatment "based on race" in this paradigm can be established by showing  intentional discrimination, or discriminatory impact.  *Schwartz v City of Treasure Island*, 544 F.3d 1201 (11th Cir. 2008);  *Hallmark Developers, Inc. v Fulton County, Ga.,* 466 F.3d 1276 (11th Cir. 2006). [10]

---

[10]  The majority view holds that a  violation of the FHA can be established without a showing of discriminatory intent. *See e.g.  Affordable Housing  Dev. Corp  v City of Fresno*,  433 F.3d 1182 (9th Cir. 2006); *Cox v City of Dallas, Tex.*, 430 F.3d 734, 746 (5th Cir. 2005), *cert. den.*, 126 S. Ct. 2039 (2006); *Charleston Housing Authority v  United  States Dept. of  Agriculture,*  419  F.3d 729 (8th Cir. 2005); *Tsombanidis v West Haven Fire Dept*, 352 F.3d 565 (2d Cir. 2003); *Oti Kaga, Inc. v South Dakota Housing Dev. Authority*, 342 F.3d 871 (8th Cir. 2003); *Macone v Town of Wakefield*, 277 F.3d 1 (1st Cir. 2002); *Langlois v Abington Housing Authority,* 207 F.3d 43 (1st Cir. 2000); *292 Sherman Ave Tenants' Ass'n v District of Columbia*, 444 F.3d 673 (D.C. Cir. 2006).

To prove intentional discrimination, the plaintiff has the burden of showing that the defendant acted intentionally, or was improperly motived in its decision to discriminate against persons protected by the FHA.  *Bonasera v City of Norcross*, 2009 WL 2569097 (11th Cir. 2009)(unpub). This can be accomplished with evidence that the decision making body acted for the sole purpose of effecting the desires of private citizens, that racial considerations were a motivating factor behind those desires, and that members of the decision making body were aware of the motivations of the private citizens. *Hallmark Developers, Inc. v Fulton County, Ga.,* 466 F.3d 1276 (11th Cir. 2006).

In contrast, to establish a *prima facie* disparate impact claim, it is sufficient for  plaintiff to demonstrate that the challenged action results in, or can be predicted to result in, a disparate impact upon a protected class compared to the relevant population as a whole. *Bonasera v City of Norcross*, *supra,*  citing *Jackson v Okaloosa County,* 21 F.3d 1531 (11th Cir. 1994); *Oti Kaga, Inc. v South Dakota Housing  Development Authority,*  342 F.3d 871, 883 (8th Cir. 2003).   A plaintiff can show discriminatory effect  in two ways – first, by showing that the decision has a desgregative effect, and second, by showing that the decision  makes housing options significantly more restricted  for members of a protected group than for persons outside  that group.  *Bonasera,*  citing *Housing Investors, Inc. V City of  Clanton, Ala.,* 68  F. Supp. 2d 1287, 1298 (M. D. Ala. 1999).  Typically, a disparate impact is demonstrated  by statistics. *Id.*

In this case,  plaintiffs allege that County defendants violated the FHA  in three ways: (1) the development and implementation of a housing  plan having disparate impact on African-American families, giving rise to a denial of housing opportunities based on race inn violation of 42 U.S.C. §3604(a)(Count 1); (2) the implementation of housing plan intentionally designed to force

African-American residents out of the redeveloped neighborhood, giving rise to denial of housing opportunities based on race in violation of 42 U.S.C. §3604(a) (Count 3), and (3) the issuance of a statement displaying a racial preference in violation of 42 U.S.C. §3604(c)(Count 4).

### a. disparate impact claim

In support of their disparate impact claim, plaintiffs present statistical evidence pertaining to the population displaced by the demolition of Scott-Carver Homes and the relevant demographics in the larger metropolitan community. Specifically, they show that 99% of persons displaced from Scott-Carver housing project are African-American, while 64% of the MHDA public housing population is African-American, and 20% of the Miami-Dade County population is African-America.

Assuming, for the purpose of this analysis, that the statistics proffered establish a *prima facie* disparate impact case, *see e.g. Charleston Housing Authority v United States Dept. of Agriculture,* 419 F.3d 729 (8th Cir. 2005)(*prima facie* disparate impact case established where undisputed evidence showed demolition of low income housing complex would have disproportionate impact on African-Americans, since majority of tenants in housing project were African-American); *United States v City of Black Jack, Missouri*, 508 F.2d 1179 (8th Cir.), *cert. den.*, 422 U.S. 1042 (1975), the court proceeds to examine the subsequent steps of FHA disparate impact burden shifting analysis.

Under the second step, the MHDA must show that its proposed action has a "manifest relationship" to a legitimate, nondiscriminatory policy objective, and that the action is justifiable because it is necessary to the attainment of that objective. *Charlestown Housing Authority v United States Dept. of Agriculture*, 419 F.3d 729 (8th Cir. 2005); *Oti Kaga*, 342 F.3d at 883. If it makes this

showing, the burden shifts back to plaintiffs to show the existence of a viable alternative which could achieve that goal without the discriminatory effect. *Huntington Branch, N.A.A.C.P. v Town of Huntington*, 844 F.2d 926 (2d Cir.), *aff'd in part*, 488 U.S. 15 (1988).

The County justifies its plan as necessary to reduce low-income housing density, while preserving housing opportunities for Scott-Carver residents within the general vicinity of their home neighborhood. In this sense, its objectives coincide with the overarching federal statutory goal of poverty de-concentration and development of sustainable, mixed income communities. *See* 42 U.S.C. § 1437v(a)(3)(calling for "housing that will avoid or decrease the concentration of very low income families") and 42 U.S.C. § 1437p(d)(implementing the goal of reducing the concentration of low income public housing by providing that replacement housing is permitted on site following the demolition of obsolete housing "*if* the number of replacement public housing units is significantly fewer than the number of units demolished"). By thus seeking to shift the model of public housing in Scott-Carver Homes from that of densely clustered, low-income housing to one of economic integration, without isolation of the development from the rest of the community, the County has articulated a legitimate, facially neutral objective which coincides with the goals of the federal statutory scheme. As plaintiff does not proffer any evidence suggesting that the County's proffered objective is a pretext for race discrimination, the County has sustained its burden of proof at this stage of the analysis. *See Darst-Webbe Tenant Association v St. Louis Housing Authority,* 417 F.3d 898 (8th Cir. 2005). *Compare Charlestown Housing Authority, supra* (finding issue of pretext where Housing Authority falsely represented the low income population density at the location in question).

Accordingly, the burden shifts back to plaintiffs to show the existence of an available

alternative which would have a less discriminatory impact. Here, plaintiffs urge that the County's Revitalization Plan could and should be amended to accommodate their demand for one-for-one replacement of all demolished low income public housing rental units in or around the surrounding neighborhoods of the original Scott-Carver housing project site. As evidence of the County's own belief that such a plan is feasible and could be implemented without running afoul of federal funding requirements, they focus on the Miami- Dade County Board of County Commissioner's 2008 Resolution calling for use of "best efforts" in the construction of 850 new public housing rental units, with a right of first refusal proffered to former Scott-Carver residents.

While this proffer perhaps raises an issue pertaining to the feasability of the designated alternative, it does not satisfy plaintiffs' burden of showing examples of viable alternatives that satisfy the County's legitimate objective of poverty de-concentration *while at the same time reducing the discriminatory impact on African-Americans.* That is, plaintiffs do not proffer evidence of a plan that guarantees one- for- one replacement of traditional public housing units which would actually have a lesser impact on protected class members. Without any evidence of a reliable prediction of the composition of the post development population, plaintiffs fail to raise a fact question on whether their proposed plan is likely to achieve a lesser discriminatory impact than the City's plan, and hence fail to carry their burden of proof in this third and final phase of FHA disparate impact burden shifting analysis. *See Darst -Webbe, supra.* Thus, summary judgment is appropriately entered in favor of the County defendants on this claim.

### b. Intentional Discrimination Claim (Count 3)

Plaintiffs alternatively seek to establish an intentional discrimination FHA claim against the County. To prove intentional discrimination, plaintiffs must show that defendants acted

intentionally or were improperly motivated in their decision to discriminate against persons protected by the FHA. *Bonasera v City of Norcross*, 2009 WL 2569079 (11th Cir. 2009)(unpub.), *citing Reese v Miami Dade County,* 242 F. Supp. 2d 1292 (S. Fla. 2002).

Plaintiffs claim that the County defendants intentionally discriminated against them by creating and implementing a race-based redevelopment plan purposefully designed to prevent all but a few of the original Scott-Carver African-American residents from returning to the original site and living in redeveloped units. Their theory of liability here is based on direct evidence of discriminatory intent embodied in statements contained in the County's 1999 HOPE VI application, where, under items "we cannot control," the County stated that it was required to follow a federal mandate from HUD to "lessen concentration of poverty" and "discourage concentration of minorities in undesirable neighborhoods." Plaintiffs also claim that the contours of the city's revitalization plan were informed by overt, race-based advice from HUD Deputy Director Bob Prescott, who advised that the 1996 redevelopment proposal was rejected because it was "still almost 100% single head of household, non-working, mostly AFDC, 97% African American housing consisting of like families."

Upon consideration of record as a whole, the Court does not find this evidence sufficient to raise a genuine question of fact on the issue of whether the County and its employees acted with conscious intent to discourage or prevent African American families from returning to the redeveloped project. A full reading of the record shows that the County was motivated by a desire to deconcentrate poverty, rather than any animus toward the predominant African-American population which resided in the original Scott- Carver Homes project. There is no evidence of such illicit motive on the part of any board member, and no evidence that the board was reacting

to racially motivated citizen complaints targeted  against African Americans when it formulated its redevelopment plan.

Because plaintiffs do not present evidence from which a fact finder could reasonably conclude the County  was motivated by race in its decision to demolish the Scott-Carver Homes and replace the project  with a  mixed  income community, their intentional discrimination claim under the FHA necessarily fails.  *See Bonasera, supra.*

### c.  Illegal Statement of Racial Preference (Count 4)

Section 3604 (c) of the Fair Housing Act makes it unlawful to "make, print or publish, or cause  to be made, printed or published,  any notice, statement or  advertisement, with  respect  to the ...rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, ... sex [or] familial  status...or  an  intention  to  make  a  any  such  preference,  limitation,  or discrimination."

Plaintiffs claim that language in County Defendants' application under "We Cannot Control" referring to "HOPE VI requisites mandated by HUD" which require County to "lessen the concentration of poverty; [discourage] concentrations  of minorities in undesirable neighborhoods," constitutes such a statement of illegal preference or discrimination.

The predecessor judge  found this language  is not discriminatory on its face because it does not indicate a preference based on race, or express an intention to discriminate or make a preference based on race.  *Reese v Miami -Dade County*, 242 F. Supp. 2d 1292, 1302 (S.D. Fla. 2002).  This court agrees.

The expression of a general  intent to pursue an affirmative, integrated  fair housing plan pursuant to a larger urban revitalization project  does not constitute a publication of a statement

indicating a preference based on race, or an intention to make such a preference within the meaning of the FHA where, as here, the statement contains no racial quota or other provision purporting to make race a factor in deciding who will be permitted to purchase the redeveloped homes. *See South-Suburban Housing Center v Greater South Suburban Bd. of Realtors*, 935 F.2d 868 (7th Cir. 1991)(affirmative housing marketing plan which vendor of homes imposed on real estate agent, including requirement for advertisement of homes in media with predominantly white circulation, did not constitute publication of statement indicating a preference based on race in violation of FHA, where plan did not deter black home buyers from pursuing their interests in homes nor preclude agents from showing homes to black potential purchasers), *cert. den.*, 502 U.S. 1074 (1992).

## 2. Equal Protection Claim (§ 1983) (Count 8 )

On their equal protection claim, asserted under 42 U.S.C. §1983, plaintiffs contend that the County's revitalization plan creates an express racial classification meriting "strict scrutiny," requiring that the classification be (1) justified by a compelling governmental interest, and (2) narrowly tailored to furthering that interest in order to pass constitutional muster. *Adarand Constructors, Inc. v Pena,* 515 U.S. 227, 115 S. Ct. 2097, 132 L. Ed.2d 158 (1995).

Proof of discriminatory purpose or intent is necessary to establish a violation of the equal protection clause. *Village of Arlington Heights v Metropolitan Housing Development Corp.,* 429 U.S. 252, 264-71 (1977). To prove discriminatory purpose in this context, it is sufficient that plaintiffs simply show race was *a* motivating favor in the challenged decision making process. *Id*. at 265-66.

In support of their equal protection claim against the County, plaintiffs rely heavily on the United States Supreme Court's decision in *Parents Involved in Community Schools v Seattle School*

*District No. 1*, 551 U.S. 701, 127 S. Ct. 2738, 168 L. Ed.2d 508 (2007) and the Fifth Circuit's opinion in *Walker v City of Mesquite*, 169 F.3d 973 (5th Cir. 1999), *cert. den.*, 528 U.S. 1131 (2000) as illustrations of "strict scrutiny" analysis applied to "benign" racial classifications geared toward integration.

In *Parents Involved*, the court applied strict scrutiny to evaluate the constitutionality of high school and elementary school student assignment plans that relied on race to determine which schools certain children may attend. The school districts justified their action as necessary to reduce racial concentrations and promote the overarching goal of racial diversity in elementary and secondary schools.

The Supreme Court noted that the student assignment plans, in design and operation, were were directed only to racial balance, and that "racial balancing" could not be transformed from "patently unconstitutional" to a compelling state interest simply by re-labeling it "racial diversity." In reaching this result, it distinguished its prior opinion in *Grutter v Bollinger,* 539 U.S. 306, 123 S. Ct. 2325, 156 L. Ed.2d 304 (2003), where it recognized the interest in racial diversity in higher education as a compelling government interest sufficient to withstand strict scrutiny analysis. In *Grutter*, it held that a state university law school had a compelling interest in attaining a diverse student body, where its admission policy was not focused on race alone but encompassed "all factors that may contribute to student body diversity." That is, *Grutter* permitted consideration of race as "a factor" in a holistic, individualized admission review process designed to achieve "exposure to widely diverse people, culture, idea and viewpoints" in the context of higher education, while the student assignment plans in *Parents Involved* impermissibly used race as "the factor" which alone determined student assignments for some in a non-individual, mechanical way. *Parents Involved*

at  723-724.

In *Walke*r, the Fifth Circuit applied strict scrutiny analysis to a district  court  remedial order requiring  new public housing  to be built in "predominantly white neighborhoods," and found the remedial order violated equal protection because it was not narrowly tailored to remedy vestiges of past discrimination and segregation within  the city's public housing programs, given the success of the city's  Section 8 system, the availability of viable, nonracial, nondiscriminatory site selection criteria, and race-neutral, good  faith efforts on part of the City and  HUD to remedy the wrongs of the past.

Unlike the student assignment plans at issue  in *Parents Involved*, or the remedial order in *Walker  v  City of Mesquite*, the housing redevelopment plan of the County at issue here is  facially race-neutral.  It does not set racial quotas for the redeveloped housing, or establish  site selection criteria based on race.  Rather, it is simply  geared, consistent with the underlying goals of the  HOPE VI program, toward the  de-concentration of poverty, regardless of the racial composition of the resulting  populations.   *See  Reese v Miami Dade County*, 242 F. Supp. 1292 (S.D. Fla. 2002).

To the extent that  "deconcentration of minorities" is also identified as a goal of the County's redevelopment plan, it is  but one factor weighed in with others aimed at pursuing the County's overarching goal of   deconcentration of poverty and economic integration.

Thus,  plaintiffs' reliance on *Parents Involved*,  *Walker* and similar "strict scrutiny" equal protection cases is  misplaced   because the County's   plan is not based on express racial classifications,  does not  expressly limit or prohibit housing opportunities based on race, and does not   require integration or desegregation based on racial compositions.  More specifically, as approved by HUD, the County's plan does not require integration of  former Scott -Carver residents

into "predominantly white" communities, *cf. Walker v City of Mesquite, supra,* and it does not set racial quotas for residents of the redeveloped property or the neighboring communities absorbing the relocated Scott Carver displacees. *Cf. United States v Starrett City Associates*, 840 F.2d 1096 (2d Cir.1988)(racial ceilings used to prevent "white flight" and maintain current integration levels held unlawful under Fair Housing Act, where quotas caused qualified minority applicants to wait longer for apartments than whites), *cert. den*., 488 U.S. 946 (1988); *United States v Charlottesville Redevelopment and Housing Authority,* 718 F. Supp. 461 (W.D. Va. 1989)(race conscious tenant selection policy in public housing project which gave preferential treatment to white applicants to achieve a 50/50 mix of black and white residents held unlawful under FHA; interest in racial integration alone insufficient to justify a racial quota systems which lessened housing opportunities for minorities).

The County's plan in this case calls for creation of different types of affordable housing geared toward *economic* integration and diversity. Rather than create express racial classifications for on- site or off-site housing, the plan requires the marketing of all new, affordable housing units on a nondiscriminatory basis to all races. Since the County's 1999 revitalization plan is facially neutral, it is subject to strict scrutiny review "only if it can be proved that the law was 'motivated by a racial purpose or object,' or is unexplainable on grounds other than race." *Hunt v Cromartie*, 526 U.S. 541, 546 , 119 S. Ct. 1545, 143 L. Ed.2d 731 (1999). Because plaintiffs do not make this showing, the County's revitalization scheme is subject to simple "rational basis" equal protection review.

It survives this minimal level of scrutiny because the County has a legitimate governmental interest in the de-concentration of poverty and integration of impoverished families into the larger

community, and its proposed redevelopment plan is rationally related to advancing those interests.

*See e.g. Friends of Lake View School District Incorporation No. 25 of Phillips County v Beebe*, 578

F.3d 753 (8th Cir. August 25, 2009)(applying rational basis test to facially neutral Arkansas statute

requiring school districts with fewer than 350 students to be annexed by another district, where statute

classified school districts, not persons, based on average daily membership, regardless of racial

composition of student population). *See generally San Antonio Independent School Dist. v*

*Rodriguez,* 411 U.S. 1, 93 S. Ct. 1278 (1973); *City of Chicago v Shalala,* 189 F.3d 598 (7th Cir.

1999)(rational basis standard of equal protection scrutiny applied to determine constitutionality of

provisions of Welfare Reform Act of 1996 that disqualified non-citizens lawfully in the U.S. from

participating in various federally funded welfare programs)

While plaintiffs acknowledge that a policy of "poverty de-concentration" is not necessarily

or expressly racial, they argue that it should be treated as such in this case, where it is applied to an

impoverished population known to be 99% African-American. However, a showing of

discriminatory purpose requires "more than a mere awareness of the consequences," it requires

evidence of racially discriminatory intent or purpose. *See e.g. Friends of Lake View School District*

*Incorporation No. 25 of Phillips County v Beebe, supra.*

Where there is no evidence that the County's original decision to revitalize Scott- Carver

Homes was linked to the racial composition of its residents, or that the planned redevelopment of

the property was intentionally organized along racial lines, plaintiffs fail to demonstrate the existence

of a genuine issue of material fact on the issue of discriminatory intent necessary to sustain their

equal protection claim. Summary judgment shall accordingly enter upon this claim in favor of the

County defendants.

### 3. Civil Rights Act of 1964 (Count 7)

Title VI of the Civil Rights Act of 1964 (Count 7), 42 U.S.C. §2000d, prohibits discrimination against racial and ethnic minorities in programs receiving federal aid. It reaches only intentional discrimination, i.e. proof of purposeful discrimination is a necessary element of a valid claim under this statute. *Guardians Association v Civil Service Commission of City of New York*, 463 U.S. 582 (1983).

As applied in the FHA context, this provision prohibits intentional discrimination on the basis of race in the site selection process, *see e.g. B. A. S. I. C. v Kemp*, 776 F. Supp. 637 (D. R.I. 1991); *Gautreaux v Chicago Housing Authority,* 296 F. Supp. 907 (N.D. Ill. 1969), and eliminates race-based tenant preferences. *See e.g. Otero v New York City Housing Authority*, 344 F. Supp. 737 (S.D.N.Y. 1972).

As discussed above, the record in this case reveals no evidence of intentional discrimination in the development and implementation of the County's revitalization plan. Accordingly, the plaintiffs' claim under § 2000d falls along with the other intentional discrimination claims. *Anderson v Fall River Housing Authority,* 2008 WL 4372820 (D. Mass. 2008)(unpub); *Seabrook v City of New York*, 509 F. Supp. 2d 393 (S. D. N. Y. 2007).

### 4. QHWRA (Count 10)

The Quality Housing and Work Responsibility Act ("QHWRA") of 1998 requires public housing agencies like the MHDA to submit a plan to HUD every five years that contains, among other things, the agency's certification that its public housing plans will be administered in conformity with the FHA and Civil Rights Act, and "will affirmatively further fair housing." *See* U.S.C. § § 1437c-1(b)(1), § 1437c-1(d)(15).

Plaintiffs' QHWRA claim is apparently based on the premise that a violation of this statue occurred when the County certified to HUD that its public housing plans would be conducted and administered in conformity with the FHA and Civil Rights Act, when, in reality, the County had not adequately considered the racial and socio-economic effects of its planned revitalization project pursuant to its obligation to "affirmatively further fair housing." Plaintiffs seek redress for this alleged statutory violation under the vehicle of §1983.

At the outset, this court questions whether Section 1437c-1(d)(15) of QHWRA suggests a congressional intent to confer enforceable rights on plaintiffs, noting there has been some disagreement in the district courts on the issue. *Compare Wallace v Chicago Housing Authority*, 289 F. Supp. 2d 710 (N.D. Ill. 2003) (QHWRA certification provision subject to private enforcement under §1983) and *Reese v Miami Dade County*, *supra* (same) *with Thomas v Butzen*, 2005 WL 2387676 (N.D. Ill. 2005)(no private cause of action for §1437c-1(d)(15) QHWRA violation under § 1983).

In *Butzen*, the court rejected the notion that this provision of QHWRA creates rights cognizable under §1983, noting that the focus of the statute is on a public housing agency's responsibility to report to HUD; the statute is in the nature of a general policy statement too vague and amorphous to be enforced, and that plaintiffs failed to identify any specific rights allegedly conferred by the statute as required under *Blessings v Freestone*, 520 U. S. 329 (1997).[11] *Id* at *9,

---

[11] While there may be other statutory mechanisms available to enforce an alleged QHWRA violation, *see e.g. United States ex rel. Anti-Discrimination Center of Metro New York, Inc. v Westchester County, New York*, 495 F. Supp. 2d 375 (S.D. N . Y. 2007)(Qui tam relator stated claim under False Claims Act (FCA) against County based on false certification in application for federal block grant funds, where County certified grant would be administered in accord with Civil Rights and Fair Housing Act, when in fact it did not take race into consideration when evaluating fair housing impediments and take appropriate corrective action), the existence of an implied private cause of action asserted through §1983 is dubious.

citing *Gonzaga University v Doe*, 536 U.S. 273, 122 S. Ct. 2268, 153 L. Ed.2d 309 (2002).

The court need not definitively resolve this question here, because, even assuming the existence of an implied cause of action, there is no support for plaintiffs' underlying assertion that the MHDA's obligation to "affirmatively further fair housing" pursuant to this statutory certification process necessarily includes a duty to conduct racial and socio- economic studies in the course of urban redevelopment. Even if it did, as the predecessor judge concluded, the the County satisfied that obligation here by retaining Goodkin Consulting to perform an economic feasability study which it included in its 1999 HOPE VI application package. *See Reese v Miami Dade County*, 242 F. Supp. 1292, 1305 (S.D. Fla. 2002).

### 5.  HCDA Claim

### 42 U.S.C.§ 5304(d)(2) (Counts 11 &12)

The Housing and Community Development Act ("HCDA"), 42 U.S.C. § 5304(d)(2), requires, in the event of a residential displacement associated with a development project assisted with CDBG funds, that:

> Governmental agencies or private developers shall provide within the same community comparable replacement dwellings for the same number of occupants as could have been housed in the occupied and vacant occupiable low and moderate income dwelling units demolished or converted to a use other than for housing for low and moderate income persons, and provide that such replacement housing may include existing housing assisted with project based assistance provided under section 1437f of this title.

42 U.S.C. § 5304(d)(2)(A)(i).

Plaintiffs assert that the County's revitalization plan is a project assisted with CDBG funds because the County committed, as part of its matching funds, $2 million dollars in CDBG funds (federal funds allocated to the County by HUD). Plaintiffs charge that the County defendants are accordingly obligated under § 5304(d)(2) to create one-for-one replacement dwellings as part of

its revitalization plan.

At the outset, this court questions whether the HCDA creates an implied private cause of action enforceable against the County under §1983. *See Price v City of Stockton*, 390 F.3d 1105 (9th Cir. 2004)(finding private cause of action under Section 104(d)(2)(A)(iii) and (iv), but no private cause of action under 104(d)(2)(A)(i) or (ii), noting that requirements of latter are directed to governmental agencies and private developers and are phrased in aggregate terms, without reference to individual displaced persons).

Even assuming a private cause of action might be implied, the claim does not survive summary judgment in this case, where the premise of plaintiffs' suit is inconsistent with the Congressional goal of reducing density in public housing complexes and the related elimination of one- for- one replacement requirements for HOPE VI funded projects. *See Darst Webbe Tenant Ass'n Bd*, 339 F.3d 702, 714 (5th Cir. 2003) (enforcing one- for- one replacement would run contrary to Congressional goal of decreasing density of public housing complexes); *Reese v Miami Dade County, supra*.

### B.   Federal Defendants

### 1. Threshold Jurisdictional Challenges

### a.   Sovereign Immunity

Plaintiffs seek to enforce their statutory claims against the federal defendants under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq*. Section 702 of the Act provides a limited waiver of the federal government's sovereign immunity for claims challenging certain agency action, but this waiver is limited by Section 704, which provides that a federal court may only review agency action "made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

32

The federal defendants contend, first, that the APA does not effect a waiver of sovereign immunity on any of claims asserted against them because plaintiffs have an adequate remedy for these alleged wrongs against the County. *See Cannon v University of Chicago*, 441 U.S. 677 (1979); *ADAPT v HUD*, 170 F.3d 381 (3d Cir. 1999)(generalized challenge to HUD action based on alleged failure to undertake any enforcement and oversight activity not subject to APA review; plaintiffs could pursue their claims of housing discrimination directly against federal funding recipients").

However, this is not a general "negligent oversight" or "negligent enforcement" case; rather, plaintiffs challenge a specific decision of HUD to approve and fund a particular County's plan. This court has jurisdiction under the APA to review this level of HUD decision making. *Anderson v Jackson*, 556 F.3d 351 (5th Cir. 2009)(jurisdiction to review HUD Secretary decision to permit demolition of public housing); *NAACP v HUD*, 817 F.2d 149 (1st Cir. 1987)( jurisdiction to review HUD action where plaintiffs "pointed to a pattern of specific grant decisions by HUD").

### b. Discretionary Act Exception

In Count 13, plaintiffs claim that HUD violated the Housing Community and Development Act ( HCDA) when it approved the County's plan without enforcing the HCDA's alleged one for one replacement requirement.

The federal defendants contend the APA's limited waiver of sovereign immunity does not allow this claim because it effectively seeks review of an enforcement decision which is committed to agency discretion by law. *See e.g. Heckler v Chaney*, 470 U.S. 821 (1985)(no APA jurisdiction to review prisoner's challenge to failure of FDA to enforce possible violations of Food and Drug Act in use of drugs for human executions; APA does not generally provide review of passive failure to prosecute or enforce).

However, plaintiff's Complaint does not challenge HUD's passive decision to enforce or

prosecute a federal law; rather, it challenges its decision to fund the project despite the County's failure to incorporate one-for-one replacement housing as allegedly required under the HCDA. The "discretionary acts" exception to sovereign immunity does not apply to such a claim. *See e.g. Citizens to Preserve Overton Park v Volpe*, 401 U.S. 402 (1971), *abrogated on other grounds, Califano v Saunders*, 430 U.S. 99, 105 (1977)(upholding APA jurisdiction to review Secretary of Transportation's approval of building of interstate highway). *See also NAACP v Secretary of HUD*, 817 F.2d 149 (1st Cir. 1987)(although HUD possesses broad discretionary powers to develop, award and administer its grants and to decide the degree to which they can be shaped to help achieve Title VII goals, HUD's affirmative duty to further fair housing under the FHA is not committed to agency discretion and is reviewable under the APA).

### c. Mootness

Federal defendants alternatively claim that all claims for injunctive relief are moot at this juncture because the demolition of Scott-Carver Homes and relocation of its original tenant base is now complete.

The current complaint seeks affirmative injunctive relief concerning the development and particulars of the County's replacement housing plan. This segment of plaintiffs' demand for injunctive relief is not mooted by the demolition and interim relocation of the original Scott-Carver Home residents.

In addition, the County has proposed a revision to its revitalization plan which is still pending before HUD for approval. With the implementation of the original plan at a virtual standstill, and a proposed revision pending for approval before HUD, the mootness challenge to plaintiffs' complaint for injunctive relief is without merit. *See Coliseum Square Ass'n v Jackson,* 465 F.3d 215 (5th Cir. 2006).

### d. Standing

Federal defendants contend that plaintiffs lack standing to bring these claims because the requested injunctive relief seeking replacement of demolished public housing units on a one- for-one basis would violate Congress' express mandate regarding replacement housing and undermine the statutory goal of "providing housing that will avoid or decrease the concentration of very low income families. 42 U.S.C. § 1437v(a)(3). This argument is dismissed summarily because the merit of plaintiffs' statutory challenges does not defeat their standing to assert the claims as parties allegedly injured by the relevant conduct of the defendants.

With each of the federal government's threshold jurisdictional challenges rejected, the court's inquiry turns to the substantive challenge to each of the claims asserted against the Federal defendants.

### 2. Intentional Discrimination Claims (Counts 6, 9):

### [Purposeful Use of Race Based Criteria in Approving/Funding 1999 Plan]

Plaintiffs claim that HUD violated the FHA guarantee of fair housing (Count 6) and the Fifth Amendment equal protection clause (Count 9) by intentional discrimination, i.e. by purposefully using race-based criteria in approving and funding the MDHA's 1999 Revitalization Plan.

As direct evidence of the alleged intentional discrimination, plaintiffs point to:

(1) HUD's approval and funding of a HOPE VI application purposefully designed to achieve "deconcentration of minorities" and

(2) HUD's encouragement and knowledge of the MDHA's improper motivation of racial deconcentration/integration.

In support of this claim, plaintiffs again emphasize the statement in the County's 1999

HOPE VI application regarding its obligation under HUD requirements and the *Adker* decree to "discourag[e] concentrations of minorities in undesirable neighborhoods," and a similar statement in the County's promotional community educational materials which identify a "winning application" as one which is designed to "discourag[e] concentration of minorities." Plaintiffs contend that these statements were directly encouraged and solicited by HUD, which, in its own scoring system, included a scoring criteria entitled "lessen concentration" which awarded points for development of a "physical plan" that reduced concentration of low income residents on site, and ensured that off site housing avoid neighborhoods with "high concentrations of minorities."[12]

They also cite the testimony of Robert Levis, co-author of the County's 1999 HOPE VI grant proposal, who testified that he understood the HOPE VI program imposed an obligation to "affirmatively furthering fair housing" by "discouraging concentrations of minorities in undesirable neighborhoods," and that he derived this impression from the HUD NOFAs under which he labored in 1996, 1997 and 1998, as well as HUD's "critiques" of the County's 1996 unsuccessful application.

Further, plaintiffs point to evidence that federal defendants denied prior HOPE VI applications of the County due to its failure to deconcentrate poverty and minority populations; that a high ranking HUD staff debriefed County officials on deficiencies of prior proposals using explicit racial terms; that the 1999 Notice of Funding Availability (Super NOFA) included project structuring and scoring criteria incorporating specific racial components; that County defendants

_____

[12] Also, they point to a Scoring "Guidance" developed by HUD in 1999 for evaluation of HOPE VI applications by the Fair Housing and Equal Opportunity (FHEO) Office which reiterates NOFA advice that "locations of [off site] housing will not be in neighborhoods with high levels of poverty and/or high concentrations of minorities." The Guidance goes further, citing specific actions like "selecting sites for replacement housing that have the effect of deconcentrating minority persons..." and "reduc[ing] the existence of racially identifiable projects."

profess to have absorbed the HUD requirement of "deconcentrating minorities" from these sources; that the "we cannot control" section of 1999 application evinces the County's belief that HUD required a deconcentration of minorities; and that HUD never amended its NOFA to delete the reference to "deconcentration of minorities" and never communicated any contrary understanding to the County defendants.

The court disagrees with plaintiff's assessment of these statements as creation of express "race based" selection criteria. The evidence shows that HUD awarded the MDHA's HOPE VI grant based on HUD's scoring (96/100) of the County's 1999 HOPE VI application using a multi-factor, race-neutral rating system. Under the third point or factor, "soundness of approach," there is a subfactor for "affirmatively furthering fair housing," which, according to the accompanying Application Kit, includes a requirement that applicant's marketing and outreach efforts " be targeted to all segments of the population on a nondiscriminatory basis, promote housing choices and opportunity throughout your jurisdiction, and contribute to the deconcentration of minority and low income neighborhoods." 64 Fed. Reg. 9736-37; AR 61-62.

There is nothing in this subfactor or any other scoring criteria used by HUD for reviewing 1999 HOPE VI applications which includes an allocation of points specifically for "deconcentration of minorities" and nothing in the scoring criteria which includes an express racial preference or other race based criteria for replacement housing.[13] Instead, scoring guidelines published by HUD's Office of Fair Housing and Equal Opportunity (FHEO) regarding this

_____

[13]Although the HUD Application Kit also includes a statement indicating that plans for off-site housing should ensure that the housing will not be in "neighborhoods with high levels of poverty and/or high concentration of minorities," HUD explains that this provision does not apply in situations where the redeveloped housing is located on the site of the existing development or in its surrounding neighborhood, as is the case here. There is no evidence offered to contradict this interpretation.

subfactor state that "[Housing Authorities] should include in their work plans specific steps they will take to (1) address the elimination of impediments to fair housing choice...(2) remedy discrimination in housing; or (3) promote fair housing rights and fair housing choice." Wilson Affidavit, ¶8 citing A.R. 426.

In addition, the FHEO review of the County's plan concluded that "MDHA proposes to increase the admission of higher income families into lower income communities while encouraging a more balanced mix of incomes." Wilson Affidavit, ¶9. The administrative record is thus consistent with proposition that the County's application was scored favorably because the County designed its plan to attract a broad socioeconomic range of potential residents. Such an approach is consistent with the fundamental, race neutral purpose of the HOPE VI program, i.e., to promote "housing that will avoid or decrease the concentration of very low income families." §1437v(a)(3). Plaintiffs accordingly fail to establish a *prima facie* case of intentional discrimination under the FHA or Fifth Amendment equal protection clause against the Federal defendants. The court shall accordingly enter summary judgment in favor of the Federal defendants on each of the intentional discrimination claims.

### 3.   Failure to Affirmatively Further Fair Housing  (Counts 3, 5):

Plaintiffs also contend that HUD failed to affirmatively further fair housing in violation of the general statutory mandate imposed by 42 U.S.C. §3608(e). HUD's obligation to "affirmatively further fair housing" under this provision of the FHA may subject HUD to liability in two ways: (1) First, where the department takes discriminatory action itself, such as approving federal assistance for a public housing project without considering its effect on the racial and socio-economic composition of the surrounding area, and (2) Second, when the department is aware of a grantee's discriminatory practice and makes no effort to force it into compliance with the FHA by cutting off

existing federal financial assistance to the agency in question. *Anderson v City of Alpharetta*, 737 F.2d 1530 (11th Cir. 1984).

Plaintiffs charge that HUD violated this statutory obligation in both ways -- first, by failing to adequately consider the racial and socioeconomic effects of the County's Revitalization Plan on protected class members before approving the plan (Count 5), and second, by approving the County's HOPE VI application despite its alleged inclusion of a discriminatory statement of racial preference (Count 6). It seeks to enforce these statutory violations against HUD under the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.*

This court reviews HUD's actions for compliance with the Administrative Procedure Act and a general statutory mandate under a highly deferential standard, reversing only if it finds that HUD's actions were "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Norton v Southern Utah Wilderness Alliance*, 542 U.S. 55, 124 S. Ct. 2373 (2004); *Darst-Webbe Tenant Association v St. Louis Housing Authority,* 417 F.3d 898 (8th Cir. 2005); *Preserve Endangered Areas of Cobb's History, Inc v United States Army Corps of Engineers,* 87 F.3d 1242 (11th Cir. 1996)*; N.A.A.C.P. v Secretary of HUD*, 817 F.2d 149 (1st Cir. 1987). The review is deferential because "it is not the role of the courts to micro-manage agency actions for compliance with broad, general statutory mandates." *Id*. at 907.

This case involves a broad, general statutory mandate, HUD's "duty to affirmatively further fair housing." The question presented in reviewing HUD's adherence to this policy is not whether HUD has in fact achieved tangible, adequate results in the discharge of that duty; rather, it is simply whether HUD exercised its broad authority in a manner that demonstrates consideration of, and an effort to achieve, such results. *Norton* at 124 S. Ct. at 2380-81.

The record reveals that HUD did so here, where it considered the Goodkin study submitted

with the County's application, and based its approval of the County's project on an assessment of the extent to which its plan was designed and likely to lessen concentrations of low income households, create mixed income communities and offer viable housing choices to the community (single family, apartments, rentals and homeownership) on a race-neutral basis. *See Darst-Webbe, supra*, 417 F.3d at 908.

Plaintiffs make a separate claim that HUD violated its duty to "affirmatively further fair housing" when it approved the application despite the County's inclusion of a statement of "express racial preference," apparently a reference to the County's reference to a federally mandated obligation to "[discourage] concentrations of minorities" pursuant to the *Adker* decree and HUD requirements. However, the Court finds no statement of "express racial preference" to support the charge and no other evidence evincing an abdication of HUD's responsibility to "affirmatively further fair housing" under the FHA.

Section 3608(e)(5) of the FHA charges HUD with obligation to administer its programs and activities in such a way as to further the statutory goal of providing equal housing opportunities. As a corollary principle, HUD is prohibited from funding any activity that would encourage, increase or perpetuate racial segregation. *Anderson v City of Alpharetta*, 737 F.2d 1530, 1537 (11th Cir. 1984)(HUD is subject to liability under the "affirmatively further" requirement only where it has disbursed federal funds to local housing authorities who are engaged in activities that will 'establish and add to segregation in housing patterns"), *quoting Garrett v Hamtramck*, 503 F.2d 1236 (6th Cir. 1974); *Shannon v U.S. Dept. of Housing and Urban Dev.,* 436 F.2d 809 (3d Cir. 1970).

The court previously determined that the statement in question does not amount to unlawful statement of "racial preference," and with no evidence suggesting that the MDHA's revitalization plan would contribute to racial segregation in housing patterns, there is no evidentiary basis for this

strand of the plaintiffs' "affirmatively further" argument.

Finally, the suggestion that HUD's "affirmatively further" obligation under the FHA includes an obligation to ensure a one -for- one replacement of low income replacement rental units in the planned redevelopment is without merit. *Darst- Webbe Tenant Ass'n Bd*, 339 F.3d at 714. (enforcing one for one replacement would run contrary to Congressional goal of decreasing density of public housing complexes).

### 4.  HCDA  (Count 13)

Finally, plaintiffs assert that HUD's authorization of the relocation plan despite the Count defendants' failure to comply with the terms of the Housing and Community Development act: (HCDA) violates plaintiffs' rights under the HCDA, 42 U.S.C. 5304(d)(1), requiring governmental agencies receiving a CDBG to "provide within the same community comparable replacement dwellings for the same number of occupants as could have ben housed in the occupied and vacant occupiable low and moderate income dwelling units demolished."

As indicated in connection with corresponding claim against County defendants, this HCDA claim necessarily fails because the underlying premise is false: Plaintiffs do not have a statutory right to one- for- one replacement of demolished Scott Homes public housing units. *See Reese v Miami Dade County, supra*; *Darst Webbe Tenant Ass'n Bd v St. Louis Housing Authority,* 339 F.3d 702, 714 (8th Cir. 2003).

### V.  Conclusion

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

1.  Cynthia Curry, current Interim Director of the MHDA, is **SUBSTITUTED** for Rene Rodriquez as a party defendant, and Shaun Donovan, current director of HUD, is **SUBSTITUTED** for Mel Martinez as a party defendant.

2.  Pursuant to plaintiffs' voluntary notice of dismissal, Counts 2, 14 and 15 of the plaintiffs' complaint are **DISMISSED WITH PREJUDICE**.

3.   The plaintiffs' motion for summary judgment against the County Defendants [DE# 336] is **DENIED.**

4.   The plaintiffs' motion for partial summary judgment on liability against the Federal defendants [DE# 337] is **DENIED.**

5.  The Federal defendants' motion for summary judgment against the plaintiff [DE# 347] is **GRANTED.**

6.  The County defendants' motion for summary judgment against the plaintiffs [DE# 349] is **GRANTED.**

7.  The plaintiffs' motion for attorneys' fees [DE# 331] is **DENIED.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 10th  day of November, 2009.

Daniel T. K. Hurley
United States District Judge

cc.  All counsel